UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:18-CV-00155-GNS-LLK

MELISSA R. DOWDY                                                        PLAINTIFF


v.


COMMISSIONER OF SOCIAL SECURITY                                        DEFENDANT


**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment (DN 26) and

Plaintiff's Objection (DN 34) to the Magistrate Judge's Findings of Fact, Conclusions of Law, and

Recommendation ("R&R") (DN 33).   For the reasons that follow, Plaintiff's objection is

**SUSTAINED**, and  Plaintiff's motion is **GRANTED**.

### I.        BACKGROUND

#### A.        Statement of Facts

In August 28, 2014, Plaintiff Melissa R. Dowdy ("Dowdy") began mental health treatment

at LifeSkills Counseling Center ("LifeSkills").  (Admin. R. 442-459, DN 16).  She was eventually

diagnosed with major depressive disorder that was moderate and recurrent, and she began

psychotherapy treatment.  (Admin. R. 446).  On April 8, 2015, Dowdy filed applications for

disability insurance benefits and supplemental security income alleging disabilities that began on

August 15, 2014.  (Pl.'s Mem. Supp. Mot. Summ. J. 1, DN 26-1).  On July 9, 2015, Dowdy met

with a consultative evaluating psychologist, Dr. Emily Skaggs ("Dr. Skaggs"), [1] who conducted a

---

[1] As noted in the R&R, the examination appears to have actually been performed by Dr. Kathy
Seigler and then signed off on by Dr. Skaggs.  (R&R 4 n.1).  Regardless, the Court will follow the
lead of the ALJ and the parties by referring to Dr. Skaggs when discussing this report.

mental status examination and determined that Dowdy had marked limitations across three domains, namely in her ability to "tolerate stress and pressure of day-to-day employment . . . to sustain attention and concentration towards the performance of simple, repetitive tasks . . . [and] her capacity to respond appropriately to supervisors and coworkers in a work setting . . . ."[2] (Admin. R. 465-66). After this examination, it appears that Dr. Skaggs's report and the record were reviewed by a non-examining state agency physician, Dr. David Muse ("Dr. Muse"), who determined that Dowdy was not disabled. (Admin. R. 112). This conclusion by Dr. Muse was based on a finding that Dr. Skaggs's opinion "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." [3] (Admin. R. 110).

On October 12, 2017, Administrative Law Judge Gwen Hurley (the "ALJ") conducted a hearing on Dowdy's claims. (Pl.'s Mem. Supp. Mot. Summ. J. 2). The ALJ applied the familiar five-step sequential process established by the Social Security Administration and determined, on February 28, 2018, that Dowdy was not suffering from a disability within the meaning of the Social Security Act. (R&R 2, DN 33). First, the ALJ found that Dowdy had not engaged in substantial gainful activity since the alleged onset date, August 15, 2014. (R&R 2; Admin. R. 13). Second, the ALJ found that Dowdy suffered from the following severe impairments: major depressive disorder, anxiety, degenerative disc disease, and degenerative joint disease.[4] (R&R 2; Admin. R. 13). Third, the ALJ concluded that Dowdy's impairments did not match or equal the severity of

---

[2] "Marked" was, in turn, defined as a "serious limitation in this area, the ability to function is severely limited but not precluded."

[3] This exact language is repeated throughout the record in the various reports by different state agency examining physicians. (Admin. R. 110, 128, 142).

[4] Dowdy also suffers from some additional physical impairments, such as fibromyalgia and thyroid disease, which are not the primary basis for her alleged impairments. (Admin. R. 471).

the impairments listed in Appendix 1 of the regulations. (R&R 2; Admin. R. 13). Fourth, the ALJ

found that Dowdy had a "residual functional capacity to perform less than the full range of light

work" and noted:

> [Dowdy] can frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; occasionally reach overhead with the left upper extremity; and never climb ladders, ropes, and scaffolds. [She] is unable to work around hazardous machinery[,] unprotected heights or with vibrating equipment. Mentally, she is restricted to simple[,] routine and repetitive tasks that are not performed at a production-rate pace such as an assembly line. She can make simple decision. She can tolerate occasional changes in the work routine. [She] is able to occasionally interact with co-workers and supervisors, but she is unable to interact with the public except for brief superficial interactions such as greeting and directions.

(R&R 2-3 (internal citations omitted) (citation omitted)). Given Dowdy's residual functional

capacity ("RFC"), the ALJ concluded that she was still capable of performing her past relevant

work as an inspector. (R&R 3; Admin. R. 20). Fifth, the ALJ alternatively found that, even if

Dowdy could not perform her previous work, she could perform other light work readily available

in the national economy. (R&R 3; Admin. R. 20-21). Dowdy sought review of her case in the

Appeals Council, which denied her request for review on June 28, 2018. (Pl.'s Mem. Supp. Mot.

Summ. J. 2).

**B.      Procedural History**

On October 26, 2018, Dowdy filed a Complaint in this Court for judicial review of the

decision of acting Commissioner Nancy A. Berryhill (the "Commissioner"),[5] via the ALJ, denying

her claim for social security disability benefits. (Compl., DN 1). The Commissioner filed an

answer on February 21, 2019. (Answer, DN 12). On May 22, 2019, Dowdy moved for summary

judgment seeking reversal of the Commissioner's decision. (Pl.'s Mot. Summ. J., DN 26). In

response, the Commissioner filed a summary of fact and law. (Def.'s Summ. Fact & Law, DN

---

[5] Andrew Saul has since replaced Berryhill as the Commissioner of Social Security.

32). The Magistrate Judge then issued the R&R recommending that this Court affirm the Commissioner's decision and dismiss Dowdy's Complaint. (R&R 2, 9). Dowdy objected to the R&R, and the Commissioner responded. (Pl.'s Obj. R&R, DN 34; Def.'s Resp. Pl.'s Obj. R&R, DN 36).

## II.    JURISDICTION

The Court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. *See* 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW

Objections to a Magistrate Judge's R&R are reviewed de novo by the district court. 28 U.S.C. § 636(b). The Commissioner of Social Security makes the initial determination as to whether a claimant is disabled and thereby entitled to benefits under the Social Security Act. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(h)). The Commissioner's decision must be upheld by the district court if it "is supported by substantial evidence and was made pursuant to proper legal standards." *Id*. (citations omitted). "Substantial evidence" for review purposes means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994) (citation omitted). The court need not agree with the Commissioner's finding; rather, the finding need only be substantially supported in the record. *Rodgers*, 486 F.3d at 241 (citing *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999)). When making this determination, the court must consider the record as a whole, but it should not resolve conflicts in evidence or decide

questions of credibility.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted);

*Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted).

## IV.    DISCUSSION

Each of Dowdy's objections are based on the ALJ's residual functional capacity determination.  "A claimant's residual functional capacity is the most that he or she can do despite his or her impairments."  *Khudhair v. Colvin*, No. 3:14-CV-581-DW, 2015 WL 2359575, at *10 (W.D. Ky. May 15, 2015) (citation omitted).  When making the RFC determination, the ALJ must consider "the claimant's physical abilities, mental abilities, other abilities affected by impairments, and total limiting effects."  *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 465 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(b)-(e)).  The ALJ will also consider descriptions of limitations as provided by the claimant, family members, neighbors, friends, and other relevant persons.  20 C.F.R. § 404.15459(a)(3).

In her motion, Dowdy contends that the ALJ made three errors when making the aforementioned RFC determination:  (1) she improperly gave no weight to the opinion of consultative psychologist Dr. Skaggs, (2) she improperly dismissed six third-party witness statements, and (3) she failed to properly account for Dowdy's symptoms of pain and fatigue. (Pl.'s Mem. Supp. Mot. Summ. J. 9-18).  The Magistrate Judge considered each of these arguments and found them to be unpersuasive.  (R&R 4-9).  As such, he recommended that this Court affirm Commissioner's decision and dismiss the Complaint.  (R&R 9).  In reviewing Dowdy's objection to the R&R and the underlying ALJ decision, this Court is mindful that it must thoroughly review the ALJ's decision but also that the "substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citation omitted).

## A. The Opinion of Dr. Emily Skaggs

Under 20 C.F.R. § 404.1527(c), an ALJ must evaluate every medical opinion received. The ALJ will then determine how much weight to give to the opinion after considering several enumerated factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(1)-(6). Moreover, "the opinion of an examining physician is entitled to less weight than the opinion of a treating physician, and the opinion of a non-examining state agency physician is entitled to the least weight of all." *Sprouse v. Colvin*, No. 1:15-CV-00151 HBB, 2016 WL 6078296, at *3 (W.D. Ky. Oct. 14, 2016) (citing 20 C.F.R. § 416.927(c)(1), (c)(2), and (e)). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citation omitted).

As required, the ALJ here reviewed the full record and evaluated the report of consultative evaluating psychologist Dr. Emily Skaggs, Psy.D. ("Dr. Skaggs"). The ALJ concluded as follows:

> Dr. Skaggs' opinion has been given no weight,[6] as it is not supported by the longitudinal record and appears to be based on the claimant's subjective complaints.[7]  The undersigned also notes that this opinion is not internally consistent. For example, Dr. Skaggs recorded that the claimant's attention and concentration towards performance of simple, repetitive tasks was marked, yet during examination, the claimant was able to perform various memory and mathematical tasks. In fact, Dr. Skaggs indicated that the claimant's attention was normal even though her depression interfered somewhat with her concentration. Likewise, Dr. Skaggs' assessed GAF score of 50 is inconsistent with disabling

---

[6] The ALJ later stated that she gave Dr. Skaggs's opinion "little weight." (Admin. R. 19).
[7] This part of the ALJ's analysis appears to be based on the opinion of Dr. Muse and later by Dr. Jack Reed, non-examining sources who largely discredited Dr. Skaggs's assessment. (Admin. R. 110, 128, 142).

mental impairment. Moreover, it is important to note that this evaluation was conducted while the claimant was not receiving any mental health treatment, and Dr. Skaggs does not emphasize or even acknowledge the implications this lack of treatment has on the results of the evaluation.

(Admin. R. 18-19).

Dowdy takes issue with almost every part of the ALJ's analysis. Specifically, she argues that (1) Dr. Skaggs's report was not solely based on subjective complaints, (2) it was not internally inconsistent, (3) the ALJ incorrectly characterizes the GAF score, (4) she incorrectly stated that Dowdy was not receiving treatment at the time of the evaluation, and (5) the report was not contradicted by the longitudinal record. (Pl.'s Mem. Supp. Mot. Summ. J. 9-12). Many of Dowdy's arguments persuasively point out serious factual and legal mistakes made by the ALJ. As discussed below, the Court concludes that the Commissioner's decision was not based on substantial evidence. *See Cole v. Astrue*, 661 F.3d 931, 939-40 (6th Cir. 2011) (concluding that the Commissioner's decision was not supported by substantial evidence because of the "ALJ's failure to follow agency rules and regulations . . . .").

First, Dowdy argues that Dr. Skaggs's report included her *observations* of Dowdy, as well as Dowdy's subjective complaints of which the ALJ expressed skepticism. (Pl.'s Mem. Supp. Mot. Summ. J. 9). The ALJ is correct that the report is based, at least in part, on Dowdy's subjective complaints to Dr. Skaggs. Specifically, the report noted that Dowdy complained of "my nerves" and that "[m]y son would tell you I'm depressed and suicidal." (Admin. R. 462). Dowdy also stated she had "severe depression for the past year, panic attacks and anger problems." (Admin. R. 463). The ALJ, in turn, questioned the reliability of this subjective information as provided by Dowdy because she gave inconsistent statements during both of her evaluations. (Admin. R. 19). But, Dowdy correctly asserts that Dr. Skaggs's report noted several of Dowdy's observable, non-subjective qualities: "her hair was messy . . . [she] was fidgety and her knee shook

throughout the assessment. . . . Her facial expression was sad, . . . Her affect was sad and mood depressed. She cried throughout the assessment. . . . [T]he examiner rated the claimant's mood a 10." (Admin. R. 464). As such, the ALJ's description of Dr. Skaggs's report as based on Dowdy's subjective complaints does not present the whole picture. Rather, Dr. Skaggs appears to have relied on her personal observations of Dowdy as well as Dowdy's subjective descriptions of her health. While the ALJ was within her right to question Dowdy's subjective complaints, the ALJ's partial mischaracterization of Dr. Skaggs's report undermines this stated reason for giving the report no weight. *See Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 527 (6th Cir. 2014) (holding that an ALJ incorrectly disregarded a medical opinion as based solely on subjective complaints because the opinion also included "observations of Plaintiff's physical symptoms and behavior.").[8]

Second, Dowdy argues that Dr. Skaggs's report was not internally inconsistent as claimed by the ALJ. (Pl.'s Mem. Supp. Mot. Summ. J. 10). The ALJ, however, specifically identified what she found inconsistent about the report. For instance, Dowdy was able to perform a variety of spelling, memory, and mathematical tasks while maintaining a normal attention, speech, and thought process. (Admin. R. 19, 464). Yet, Dr. Skaggs concluded that Dowdy's ability to concentrate on "simple, repetitive tasks appears affected to a marked degree." (Admin. R. 18-19, 466). This Court does not have to agree with the ALJ's determination that Dr. Skaggs's observations contradict her conclusion; rather, there need only be evidence in the record that

---

[8] In *Kepke v. Commissioner of Social Security*, 636 F. App'x 625 (6th Cir. 2016), the Sixth Circuit favorably discussed an ALJ's decision to discount a medical opinion that "relied heavily on . . . self-reporting, and seemed to uncritically accept as true most, if not all, of what [claimant] reported." *Id*. at 629 (internal quotation marks omitted) (citation omitted). In *Kepke*, however, the medical opinion appears to have been solely based on the claimant's self-reporting, unlike in *Keeton* and the present case in which the medical opinions were also largely based on the physicians' observations of the claimants.

allowed the ALJ to reach that conclusion. The ALJ here clearly identified the inconsistencies in the report that negatively impacted the weight that she assigned to it.[9] The Court is somewhat concerned on this point, however, because the ALJ's determination appears to have been impacted by the language used by Dr. Muse who first noted that the totality of the evidence did not support Dr. Skaggs's opinion. Yet, as clearly established in *Gayheart* and as acknowledged by the ALJ herself, the opinions of non-examining physicians are entitled to "the least weight of all." The ALJ's analysis is thereby undermined because she mischaracterized Dr. Skaggs's report and largely relied on a non-examining opinion when deciding to give no weight to an examining doctor's opinion.

Third, Dowdy takes issue with the ALJ's characterization of Dowdy's GAF score of 50 as "on the higher end of the severe mental impairment range" and "inconsistent with disabling mental impairment." (Pl.'s Mem. Supp. Mot. Summ. J. 11; Admin. R. 18-19). "GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). The relevant ranges have been characterized as follows:

> A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM–IV–TR* at 34. GAF 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

---

[9] Dowdy characterizes the ALJ's analysis on this point as "nothing more than playing doctor" with Dr. Skaggs's findings. (Pl.'s Mem. Supp. Mot. Summ. 10). But, the very job of the ALJ as prescribed by the regulations is to assess and then assign weight to often-conflicting medical opinions in the record. As noted, one factor for the ALJ to consider is supportability—i.e., "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3).

*Id*. at 503 (cleaned up). Dowdy's GAF score of 50 falls at the line between a showing of serious and moderate symptoms, just on the serious side of the line. As such, the ALJ's characterization of this score as "on the higher end of the severe mental impairment range" was a patently incorrect reading of Dr. Skaggs's report. *See Sprouse*, 2016 WL 6078296, at *4 ("Dr. Sahner also assigned Plaintiff a GAF score of 50, which is consistent with serious symptoms such as suicidal ideation, severe obsessive rituals, frequent shoplifting, or other severe social limitations."); *Colson v. Colvin*, 120 F. Supp. 3d 778, 788 (N.D. Ill. 2015) ("Moreover, [the Doctor] assigned [claimant] a GAF score of 50, indicating a serious impairment." (citations omitted)). While it is true that the Sixth Circuit has cautioned that the ALJ's consideration of a GAF score is not required and may have limited probative value—*see Kornecky*, 167 F. App'x at 511—the ALJ's misstatement on this point further undermines her analysis.

Fourth, Dowdy contends that the ALJ incorrectly asserted that "the evaluation was conducted while the claimant was not receiving any mental health treatment . . . ." (Pl.'s Mem. Supp. Mot. Summ. J. 12; Admin. R. 19). On this point, Dowdy states that she was taking Zoloft at the time, which was noted in Dr. Skaggs's report.[10] (Pl.'s Mem. Supp. Mot. Summ. J. 12; Admin. R. 462). It does therefore seem that the ALJ was incorrect in saying that Dowdy was not receiving "*any* mental health treatment." (Admin. R. 19) (emphasis added). Even so, the ALJ's statement is more properly understood as meaning that Dowdy's symptoms could be improved with additional mental health treatment. Indeed, Dr. Skaggs herself concluded that Dowdy's "mental health prognosis is good with proper treatment." (Admin. R. 466). As such, while

---

[10] The medication list submitted on September 18, 2017, also lists Doxepin to treat depression but does not list Zoloft. (Admin. R. 662-63).

mischaracterizing Dowdy's treatment, the ALJ properly considered that Dr. Skaggs's report failed to address how additional mental health treatment could improve Dowdy's ability to work.

Finally, Dowdy posits that the ALJ's statement that Dr. Skaggs's determination "is not supported by the longitudinal record" is insufficient because it does "not provide a reviewer with any insight into what aspects of the record failed to support Plaintiff's claim." (Admin. R. 18; Pl.'s Obj. R&R 2). Certainly, more clarity by the ALJ would have been helpful on review, but that clarity is not necessary to find substantial evidence supporting the ALJ's conclusion. *See Keeton*, 583 F. App'x at 527 ("It is unclear from this statement which portions of the record are inconsistent with [the medical] opinion, but this Court reviews the record as a whole to determine whether the ALJ's decision is supported by substantial evidence." (citation omitted)). Moreover, the ALJ does specifically note that other physical examinations have "regularly corroborated appropriate affect and demeanor, normal psychomotor function, and normal thought process and perception." (Admin. R. 19, 500, 504, 507, 549, 711). On the other hand, there is also evidence in the record that *supports* Dr. Skaggs's report, namely as demonstrated by the lay witness statements, Dowdy's hearing testimony, and her previous diagnosis by a physician with moderate, recurring depressive disorder. As such, Dr. Skaggs's report may be inconsistent with part of the longitudinal record but certainly not all of it. Review of evidence on that front is difficult, however, because the ALJ provides no explanation whatsoever for what parts of the record are inconsistent or why those parts of the record were given more weight than the evidence corroborating Dr. Skaggs's opinion. Without elaboration by the ALJ, the reviewing court cannot differentiate cherry picking from a proper weighing of the evidence. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

In sum, Dowdy has argued persuasively that the ALJ's determination that Dr. Skaggs's opinion should receive no weight was based in large part on mischaracterizations of the record. First, the ALJ incorrectly described the report as based on subjective complaints when it included numerous objective observations. Second, while the ALJ did note some inconsistency in Dr. Skaggs's report, this conclusion was undermined by the ALJ's reliance on non-examining physicians to contradict an examining physician. Third, the ALJ misstated the seriousness of a GAF score of 50. Fourth, while the ALJ was correct that Dowdy could improve with additional mental health treatment, the ALJ also misspoke when stating that Dowdy was not receiving *any* such treatment. Finally, the ALJ did not explain her statement that the report was "not supported by the longitudinal record." Given the numerous mistakes made by the ALJ, this Court cannot conclude that the ALJ's decision was supported by substantial evidence. *See Keeton*, 583 F. App'x at 527–28 ("Although the record contains some evidence supporting the ALJ's decision to accord [the examining physician's] opinion little weight, it is not clear that the ALJ would have come to the same conclusion had she not mischaracterized the record, supported her conclusion with inaccurate and improper reasoning, and ignored the opinions of [other physicians].").

B.     **Third Party Witness Statements**

When making a disability determination, an ALJ must consider evidence provided by non-medical sources pursuant to SSR 06-03p, including family and friends, who "may provide information from which [the ALJ] may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms." SSR 16-3P, 2017 WL 5180304, at *7 (Oct. 25, 2017).[11] The ALJ will then

---

[11] SSR 16-3P replaced the previous version, SSR 96-7p, effective for "determinations and decisions on or after March 28, 2016." SSR 16-3P, 2017 WL 5180304, at *13 n.27. Although the

"consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." *Id*. "If lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness." *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)).

The ALJ stated that she "carefully considered" the lay witness statements of Chris Hudnall, Jessica Beadnell ("Beadnell"), Ray Head, Janie Hylton ("Hylton"), Chelsea Hamlin, and Landen Cox ("Cox"). (Admin. R. 20). She assigned these opinions only "some weight" for the following reasons:

> However, since the witnesses are not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms, the accuracy of the reports is questionable. Additionally, the witness[es] cannot be considered disinterested third party witnesses whose reports would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.

(Admin. R. 20). Dowdy argues that these two reasons for giving little weight to the lay testimony "are nothing more than boilerplate truisms that could be used to discount any and all third party statements, not matter how well-supported, while lacking any specific engagements with the actual observations that these reports contained." (Pl.'s Mem. Supp. Mot. Summ. J. 12). Moreover, as pointed out by Dowdy and acknowledged by the Magistrate Judge, it is unlikely that the ALJ "carefully considered" each of these six witness statements because three of them—Hylton, Hamlin, and Cox—are not about Dowdy at all! Rather, these statements pertained to another

---

case was filed prior to March 28, 2016, the parties have not disputed that SSR 16-3P applies to the ALJ's decision, which occurred after the effective date.

claimant and were subsequently removed from the administrative record. (R&R 8; Admin. R. 925-934). It goes without saying that a careful review of those witness statements, or even a cursory one, would have revealed that they were completely unrelated to Dowdy's case. The Commissioner has in no way even attempted to explain this mistake or rebut the reasonable conclusion that the ALJ did not consider *any* of the lay witness statements. While it is true that "an ALJ's failure to cite specific evidence does not indicate that it was not considered," *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (citation omitted), the ALJ's error in this particular circumstance creates grave doubts as to whether the lay witness statements were considered, since it apparently escaped notice that three of the cited witnesses had no relation to Dowdy's claim.

On that point, the Magistrate Judge concluded that "any error was harmless because lay witness testimony 'is entitled to perceptible weight only if it is fully supported by the reports of the treating physicians.'" (R&R 8); *Simons*, 114 F. App'x at 733 (citation omitted). But, it is for the ALJ to *consider* these statements and then to *compare them* with the other medical evidence in the record. Here, there is no indication that these statements were considered nor does the ALJ even attempt to explain how the lay witness testimony either conflicted with or is supported by the evidence of record. The ALJ did not discuss at all or otherwise grapple with how the witness statements specifically interact with her analysis, which violates the directive to provide "reasons for not crediting the testimony that are germane to each witness." *Maloney*, 480 F. App'x at 810 (citation omitted). Rather, as highlighted by Dowdy, the ALJ's stated reasons for giving only some weight to the lay witness testimony—lack of medical training and potential bias—apply with equal force to *any and all* lay witnesses. Those vague rationales, especially when this Court is concerned whether the statements were reviewed at all, do not rise to the level of substantial

14

evidence. *See McKay v. Comm'r of Soc. Sec.*, No. 2:14-CV-1061, 2015 WL 6447739, at *6 (S.D. Ohio Oct. 26, 2015) ("[W]hile it is true that the ALJ must consider all of the evidence, reversible error does not occur unless it appears from the record that the ALJ simply failed to take into account at all some item of evidence which materially bears on the ultimate resolution of the case.").

Finally, if the ALJ had read the lay witness testimony, she would have found numerous statements that supported Dowdy's claims regarding her mental health and inability work. Melissa Dowdy, the claimant's mother, stated that Dowdy "does not like people and is very hard to get along with . . . ." (Admin. R. 395). Chris Hudnall, the claimant's son, discussed Dowdy's previous work and that "she cried every night at work until they fired her." (Admin. R. 396). Jessica Beadnell, the claimant's friend, said that Dowdy "has also been battling with depression for a long time. She cries a lot . . . A lot of things from her past seem to weigh on her . . . there were long periods of time when she wouldn't get out of bed, much less leave the house." (Admin. R. 397). The ALJ was certainly not required to find these lay opinions to be dispositive, but she was required to carefully consider them and then to provide *specific reasons* why she chose not to afford them substantial. *See Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984))).

## C.     Symptoms of Pain and Fatigue

Under SSR 16-3P, the ALJ must consider a claimant's symptoms and "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3P, 2017 WL 5180304, at

*3. The ALJ should also consider other enumerated factors, including (1) the claimant's daily

activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) other

factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side

effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5)

treatment, other than medication, an individual receives or has received for relief of pain or other

symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or

other symptoms; and (7) any other factors concerning an individual's functional limitations and

restrictions due to pain or other symptoms. *Id.* at *7-8. On this front, the ALJ noted that Dowdy's

"statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record . . . ." (Admin. R.

18). The ALJ continued:

> As for the claimant's statements about the intensity, persistence, and limiting
> effects of his or her symptoms, they are inconsistent. Claimant gave some
> inconsistent statements during both [of her] consultative examinations. For
> example, she stated that this was her first time applying for disability during the
> consultative psychological evaluation when it is actually her second application.
> Likewise, during her consultative physical evaluation, she proclaimed she had
> worked in a nursing home for 30 years, which is not true and contrary to the
> information she provided during the consultative psychological evaluation. While
> neither of these examples directly relate to the issue of disability, the inconsistency
> of such objective information makes the undersigned question the subjective
> information the claimant has given.

(Admin. R. 19). Based on this statement, the ALJ appears to have downplayed the significance of

Dowdy's complaints because of concerns about her credibility. While credibility determinations

previously played a large role in social security determinations,[12] subsequent regulation has

---

[12] *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("In evaluating the
claimant's subjective complaints of pain an administrative law judge may properly consider the
claimant's credibility, and we accord great deference to that credibility determination." (citations
omitted)).

removed this emphasis. SSR 16-3P replaced SSR 96-7P in large part to remove "credibility" language, and ALJ's are now cautioned against making such judgments: "In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." SSR 16-3P, 2017 WL 5180304, at *10. As such, the ALJ should not have relied upon an instance of Dowdy's general untruthfulness or confusion to determine that she was not credible to self-report her own symptoms. Rather, the ALJ should have considered specific evidence in the record that undermined Dowdy's statements about her symptoms. *See, e.g.*, *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 118 (6th Cir. 2016); *Khudhair*, 2015 WL 2359575, at *13; *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 825 (N.D. Ohio 2009). The ALJ here made little effort to address the enumerated factors.

Moreover, the ALJ seemed to identify Dowdy's "absence of treatment" as another indicator that Dowdy's was not experiencing serious symptoms related to her mental health.[13] (Admin. R. 18). The Sixth Circuit and applicable guidelines have cautioned against drawing such a conclusion, however, because the same mental health symptoms that would prevent someone from working that would also prevent them from seeking routine medical treatment. *See White*, 572 F.3d at 283 ("ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." (citing *Pate-Fires v. Astrue*, 564 F.3d

---

[13] It is unclear from the ALJ's decision whether the lack of treatment was a motivating factor in her decision to give less weight to Dowdy's subjective complaints. The Commissioner, however, seemingly accepts this articulation of the ALJ's report in the summary of fact and law. (Def.'s Summ. Fact & Law 10).

935, 945 (8th Cir. 2009)); SSR 16-3P, 2017 WL 5180304, at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."); *see also Dooley*, 656 F. App'x at 119 ("[B]efore drawing a negative inference from an individual's failure to 'seek or pursue regular medical treatment,' the ALJ must consider 'any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.'" (citation omitted)). If the ALJ intended to draw conclusions from Dowdy's lack of treatment, the ALJ was required to inquire as to why this gap in treatment occurred and then explain her conclusion in her decision. The ALJ did not do so.

The Commissioner responds that Dowdy "asks this Court to engage in speculating that she avoided treatment, but points to nothing in the record supporting that assumption." (Def.'s Summ. Fact & Law 10). This argument is flawed for three reasons, however. First, if the ALJ wanted to draw a negative inference based on Dowdy's lack of treatment, it was the ALJ who was charged with discerning *why* that was the case. Second, the Commissioner must show substantial evidence to support her decision to disregard Dowdy's subjective complaints of pain and fatigue, not the other way around. Third, there *is* in fact evidence in the record that Dowdy was avoiding treatment because of her depression. When Dowdy was asked by the ALJ at the Hearing why she was not receiving treatment, she responded: "I didn't want to go anywhere. I just – I – I just didn't want to talk about it." (Admin. R. 61). Furthermore, it does not appear that the ALJ was correct in asserting that Dowdy was not receiving any treatment. At the Hearing, Dowdy told the ALJ about

her past treatment at both Intervention Pain Specialists and LifeSkills Counseling Center and that

she was taking Zoloft.[14] (Admin. R. 58-59).

In summary then, the ALJ largely disregarded Dowdy's self-reported symptoms because

of her general untruthfulness and because she was not actively seeking mental health treatment.

These reasons are suspect, and the Commissioner has not directed this Court to any other reasons

providing substantial evidence for the ALJ's decision on this point. To the contrary, if the ALJ

had considered the record as a whole, including Dr. Skaggs's disregarded report and the lay witness

statements that went unreviewed, evidence was presented bolstering Dowdy's articulation of her

own symptoms. It is not for this Court to make an ultimate determination about Dowdy's

credibility; but, insofar as the ALJ failed to provide proper reasons for disregarding Dowdy's

symptoms, this decision cannot stand.

## V.     CONCLUSION

"If a court determines that substantial evidence does not support the Secretary's decision,

the court can reverse the decision and immediately award benefits only if all essential factual issues

have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."

*Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted).

"A judicial award of benefits is proper only where the proof of disability is overwhelming or where

the proof of disability is strong and evidence to the contrary is lacking." *Id.* (citation omitted).

This Court offers no opinion about whether Dowdy is disabled or what her proper RFC should be.

But, based on the record before this Court and the conclusions presented by the ALJ, there is not

substantial evidence to support her findings.

---

[14] Records from Intervention Pain Specialists do not appear to have ever been submitted for the
record.

The Court further believes that on remand this case should be reassigned to a different administrative law judge who can review Dowdy's case with fresh eyes. *See Hartnett v. Apfel*, 21 F. Supp. 2d 217, 223 (E.D.N.Y. 1998) (ordering the Commissioner to assign the remanded case to a different ALJ in part because the ALJ "mischaracterized [and] misunderstood the evidence before him.").

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Objection (DN 24) is **SUSTAINED**, and Plaintiff's Motion for Summary Judgment (DN 26) is **GRANTED**. The Commissioner's decision is **VACATED**, and this case is **REMANDED** for further proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g).

Greg N. Stivers, Chief Judge
United States District Court

February 25, 2020

cc:     counsel of record